# United States Court of Appeals
## For the First Circuit

No. 10-1302

MICHAEL B. ELGIN; AARON LAWSON; HENRY TUCKER;
CHRISTON COLBY, on behalf of themselves and similarly
situated men throughout the United States,

Plaintiffs, Appellants,

v.

U.S. DEPARTMENT OF THE TREASURY;
U.S. DEPARTMENT OF THE INTERIOR; UNITED STATES,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before
Boudin, Stahl and Howard,
Circuit Judges.

Harvey A. Schwartz with whom Rodgers, Powers & Schwartz was
on brief for appellants.
Jeffrey Clair, Civil Division, Department of Justice, with
whom Michael S. Raab, Civil Division, Department of Justice, Tony
West, Assistant Attorney General, and Carmen Ortiz, United States
Attorney, were on brief for appellees.

April 8, 2011

**BOUDIN, Circuit Judge**.  A federal statute bars employment in the Executive Branch of citizens and resident aliens who were required to register for the draft with the Selective Service System and who "knowingly and willfully" did not do so before age twenty-six.  In the district court, four plaintiffs, who are male United States citizens over age twenty-six, sought to challenge this statutory bar on constitutional grounds, failed on the merits, and now appeal.

The statutory bar reads as follows:

An individual--

> (1) who was born after December 31, 1959, and is or was required to register under section 3 of the Military Selective Service Act (50 U.S.C. App. 453); and

> (2) who is not so registered or knowingly and willfully did not so register before the requirement terminated or became inapplicable to the individual,

shall be ineligible for appointment to a position in an Executive agency.

5 U.S.C. § 3328(a) (2006).[1]  Section 3 of the Military Selective Service Act, 62 Stat. 604, 605, as amended, 50 U.S.C. app. § 453 (2006), empowers the President to require every male citizen and male resident alien between the ages of eighteen and twenty-six to

---

[1]"Executive agency" is defined to mean an "Executive department, a Government corporation, and an independent establishment."  5 U.S.C. § 105.

-2-

register for the draft.  In 1980, President Carter reinstituted the registration requirements for young men.  Proclamation No. 4771, 3 C.F.R. 82 (1981), reprinted as amended in 50 U.S.C. app. § 453 app. at 59-60.

The Office of Personnel Management ("OPM"), which manages civil service employment in the Executive Branch, has adopted corresponding regulations.  5 C.F.R. §§ 300.701-.707 (2010).  These regulations provide that a civil service employee who was required to register

> will be terminated by his agency under the authority of the statute and these regulations if he has not registered as required, unless he registers or unless, if no longer eligible to register, OPM determines in response to his explanation that his failure to register was neither knowing nor willful.

Id. § 300.707.

Three of the plaintiffs in this case were discharged by their federal agencies when it was discovered that they had not registered although required to do so; the fourth resigned when confronted with his failure to register and says that his resignation was forced by the statutory bar.  None of the four presently challenges the premise that his failure to register was knowing or willful, and none sought to pursue to the end the statutory remedies prescribed for civil service employees who dispute their removals.

Instead, the plaintiffs brought an original action in the district court seeking reinstatement and claiming that the statutory bar is unconstitutional; the grounds asserted are that it is both a forbidden bill of attainder under Article I, Section 9, Clause 3 of the Constitution and, because it applies to men but not women, an unlawful discrimination under the equal protection component of the Fifth Amendment. The latter claim has already been rejected by the Supreme Court, Rostker v. Goldberg, 453 U.S. 57 (1981), but the plaintiffs may intend to ask the Court to revisit the ruling.

In the district court, the government asserted that the claims were barred because the plaintiffs had a statutory route to dispute their removals or forced resignation and that this route was intended by Congress to be exclusive for cases covered by the statutory remedy. This statutory remedy, which will be described in more detail hereafter, ordinarily leads through the Merit Systems Protection Board ("MSPB" or "Board") and, on judicial review, to the U.S. Court of Appeals for the Federal Circuit. Three of the four plaintiffs did not pursue this avenue; one did but abandoned it after an adverse decision by the MSPB administrative law judge.

The district court declined to dismiss the action on jurisdictional grounds, initially sided with the plaintiffs on the bill of attainder issue, and ultimately reversed ground and decided

against the plaintiffs on their constitutional claims.  Elgin v. United States, 594 F. Supp. 2d 133 (D. Mass. 2009), vacated, 697 F. Supp. 2d 187 (D. Mass. 2010).  The plaintiffs now seek review in this court; the government continues to argue both that the district court had no jurisdiction and that, if it did, the statutory bar is constitutional.  An objection to subject matter jurisdiction takes priority, and we begin (and end) with that issue.

Ordinarily, and as a default remedy, a district court has authority as a federal court of general jurisdiction--subject to various limitations--to consider claims against federal government officials that they are acting unconstitutionally and should be enjoined.  See 28 U.S.C. § 1331 (2006); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 701-02 (1949).  Suits against the federal government itself or its departments--the plaintiffs' target here--are complicated by sovereign immunity considerations, see, e.g., FDIC v. Meyer, 510 U.S. 471, 475 (1994), but the government has invoked no such defense in this case, see 5 U.S.C. § 702; Edelman v. Jordan, 415 U.S. 651, 668 (1974).

Instead, the government argues the exclusive remedy for the removal or forced resignation of the four plaintiffs is provided by the Civil Service Reform Act ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (1978) (codified as amended in scattered sections of 5 U.S.C.).  The CSRA scheme, set forth in Title 5,

Chapter 75, Subchapter II and augmented by regulations, allows certain employees in the civil service--including those (such as the plaintiffs) in the competitive service--to seek review if they are removed "for such cause as will promote the efficiency of the service," 5 U.S.C. § 7513(a); the route prescribed is by appeal to the MSPB and, if dissatisfied with the result, appeal to the Federal Circuit, whose decisions in turn are reviewable by the Supreme Court.[2]

Although the CSRA does not in terms describe this scheme as exclusive of other remedies, Congress intended the scheme--at least where it applies and provides a mechanism for administrative and judicial review and relief--to be exclusive of ordinary district court actions to challenge a removal. The Supreme Court has suggested that this is so, United States v. Fausto, 484 U.S. 439, 443-55 (1988); see also Bush v. Lucas, 462 U.S. 367, 388-89 (1983); we have recognized it to be so, Berrios v. Dep't of the Army, 884 F.2d 28, 31 (1st Cir. 1989); and the legislative history bears out this intention, S. Rep. No. 95-969, at 9-10, 53, 63 (1978), reprinted in 1978 U.S.C.C.A.N. 2723, 2731-32, 2775, 2785.

The plaintiffs do not contest the view that the statutory route, where it applies, is the exclusive remedy for an employee

---

[2]See 5 U.S.C. §§ 7511-7514, 7701-7703; 5 C.F.R. §§ 752.401-.406, 1201.3, 1201.120. The remedy extends to "forced resignations"--the claim made by one of the plaintiffs here--which are treated as constructive "removals." See Carrow v. MSPB, 626 F.3d 1348, 1352-53 (Fed. Cir. 2010).

challenging removal; but they argue that the government has taken inconsistent positions and that, in any event, for various reasons the statutory remedy is not available to them. However, the statutory route does in fact give the plaintiffs a route to direct review of their constitutional claims by an Article III court; Congress intended that route to be exclusive in removal cases; and, despite some confusion in the precedents, both literal language and Congress' policy require that result.

First, the plaintiffs suggest that the government's objection is foreclosed because (a) it resisted efforts by one of the plaintiffs to raise this very kind of claim through the MSPB route, and (b) it has raised the subject matter jurisdiction claim only on reconsideration in the district court. But, as it turns out, the government is within its rights to raise the objection: subject matter jurisdiction claims are not waivable and may be raised for the first time even on direct appeal, Fed. R. Civ. P. 12(h)(3); United States v. Cotton, 535 U.S. 625, 630 (2002).

Failure to exhaust administrative remedies is a waivable objection. Global NAPs, Inc. v. Verizon New Eng. Inc., 603 F.3d 71, 85 (1st Cir. 2010). But, if the CSRA remedy is available and intended to be exclusive, it does not prescribe some administrative step required before resorting to district court, e.g., Woodford v. Ngo, 548 U.S. 81, 88-89 (2006); rather, the remedy displaces the plenary district court action entirely, just as a statute

channeling agency review to a circuit court displaces a direct review action in the district court. See Whitman v. Dep't of Transp., 547 U.S. 512, 513-14 (2006) (per curiam).

Second, the remedy in Chapter 75, Subchapter II applies to removals "for such cause as will promote the efficiency of the service," 5 U.S.C. § 7513(a), and the question arises whether removal on account of the statutory bar falls in that category. Arguing that section 7513(a) is limited to misconduct, the plaintiffs cite Supreme Court language stating that "Chapter 75 of the Act governs adverse action taken against employees for the 'efficiency of the service,' which includes action of the type taken here, based on misconduct," Fausto, 484 U.S. at 446. However, "includes" does not mean "limited to."

The CSRA is a successor to earlier civil service statutes, including the Lloyd-La Follette Act, which created the first general statutory protection for civil servants, see Arnett v. Kennedy, 416 U.S. 134, 149-50 (1974), and used the same "efficiency of [the] service" phrase as the substantive standard for removal, see Act of Aug. 24, 1912, ch. 389, § 6, 37 Stat. 539, 555 (repealed 1978). That standard was understood to include removals that were based on disqualifying conditions that existed before the employees were hired, and Congress was aware of and intended to adopt this interpretation.

Thus, prior to the CSRA's enactment, the Senate Committee on Governmental Affairs noted that for covered civil service employees, "existing law provides that an individual may be removed only for such cause as will promote the efficiency of the service." S. Rep. No. 95-969, at 9 (1978), reprinted in 1978 U.S.C.C.A.N. 2723, 2731. The committee reported that in 1976, 17,157 federal employees had been dismissed under that standard, and it listed eight different categories, including 240 "[r]emoved because of some condition that existed before they were hired." Id. In recommending section 7513, the committee said that it did not intend any substantive change to the existing law permitting removals only for "efficiency of the service." Id. at 50, reprinted in 1978 U.S.C.C.A.N. at 2772.

OPM shares this view of the "efficiency of the service" standard. In a related part, 5 C.F.R. pt. 731, OPM regulations discuss the standard for a "suitability action," including a "removal," 5 C.F.R. § 731.203; the regulations state that a suitability action may be taken only to "protect the integrity or promote the efficiency of the service," id. § 731.201, which includes "[a]ny statutory or regulatory bar which prevents the lawful employment of the person involved in the position in question," id. § 731.202(b)(8). See also id. § 731.501(a) (right to appeal suitability action to the MSPB).

-9-

Third, the plaintiffs question whether the removals in this case were intended as removals for the "efficiency of the service." The removal notices, it appears, cited the statutory bar, 5 U.S.C. § 3328--not Chapter 75, Subchapter II and the "efficiency of the service" phrase--but the legislative history and regulations make clear that a removal because of a statutory bar is one for the "efficiency of the service," thereby triggering the opportunity--and obligation--to use the MSPB procedures and to seek judicial review in the Federal Circuit.

The plaintiffs' contrary suggestion rests on a misreading of Department of the Navy v. Egan, 484 U.S. 518 (1988). There, the Court relied on the ground given in a removal notice to conclude that the action was taken under the "efficiency of the service" standard and not on grounds of national security. Id. at 522 & n.4, 523. A national security removal is explicitly exempted from all "other statutes" and review is narrowly limited. 5 U.S.C. § 7532; see id. § 7512(A) (exempting a section 7532 removal); Egan, 484 U.S. at 525-26. Here, no such statutory exemption applies, and the notice merely particularizes the "efficiency of the service" basis for the removal.

Fourth, the MSPB has suggested that a person who was wrongly hired in the face of an absolute statutory bar was never an "employee" at all because the appointment was void ab initio, and therefore, when the error is discovered, the person removed is not

-10-

a former "employee" who can invoke the CSRA. E.g., Hope v. Dep't of the Army, 108 M.S.P.R. 6, 9 (2008) (citing cases). This "reasoning," see Travaglini v. Dep't of Educ., 18 M.S.P.R. 127, 132-37 (1983), aff'd as modified, 23 M.S.P.R. 417 (1984), underlies statements by the Board, occasionally noted but not endorsed by the Federal Circuit,[3] that a removal because of an absolute statutory bar is outside the Board's authority under the CSRA because the employee should not have been hired in the first place.

This is not the approach taken by modern courts in construing remedial statutes, and the government should be embarrassed ever to have taken advantage of such question begging rhetoric. The plaintiffs in this case were hired by the federal government, served (in some cases for many years) as its employees, exercised official authority, and were then terminated. The idea that Congress would implicitly exclude them from the category of former "employees" entitled to seek redress under the CSRA--if and

---

[3]In Diamond v. U.S. Agency for International Development, 108 F.3d 312 (Fed. Cir. 1997), the Federal Circuit mentioned the MSPB assertion, without passing on its validity, saying only that it did not apply to the case at hand. Id. at 316. In Daneshpayeh v. Department of the Air Force, No. 93-3476, 1994 WL 18964 (Fed. Cir. Jan. 26, 1994) (per curiam)--an unpublished, non-precedential decision, see Fed. Cir. R. 32.1, 36--the Federal Circuit affirmed an MSPB decision dismissing an appeal based on the supposed rule, but the court noted that the removed person took "no issue with the Board's recital of the applicable law" id. at *2, and suggested doubts as to the "Board's boiler-plate labeling of its decision as based on a 'lack of jurisdiction,'" id. at *2 n.4.

-11-

to the extent that their removal was outside a statutory bar or that the bar was itself unconstitutional--beggars belief.

The CSRA governs "removals"; nothing in its language suggests that a case involving a statutory bar follows a different route; and the legislative history already described refutes any such suggestion. Of course, if the employee comes within the statutory bar and the statutory bar is constitutional, the discharged employee will not get reinstated; but the proper outcome should be a decision denying reinstatement on the merits. Thus, the statutory route gives the plaintiff a full opportunity to present both questions to the Federal Circuit, which is an Article III court.

Fifth, this brings us at last to the question whether there is some implied exception to the exclusive CSRA remedy because the challenge in this case is a constitutional one sounding in equity or because it is a facial constitutional attack rather than an "as-applied" challenge. The Supreme Court has already ruled that Bivens-type constitutional claims for damages cannot bypass CSRA limitations, Lucas, 462 U.S. at 368; and as to equitable constitutional claims, there is something of a circuit

split,[4] but this circuit has been firm in treating the CSRA remedy as exclusive as to equitable constitutional claims as well.

Thus, this court held in Berrios that an employee fired by the government could not bring a due process claim and other facial and as-applied constitutional claims by an original action in the district court but had to follow the CSRA scheme through the MSPB into the Federal Circuit. 884 F.2d at 31. Another decision in this circuit reaffirmed the general rule but found it inapplicable because the employee's classification excluded him from the CSRA remedy. Pathak v. Dep't of Veterans Affairs, 274 F.3d 28, 31-33 (1st Cir. 2001); see also Irizarry v. United States, 427 F.3d 76, 77-78 (1st Cir. 2005). None of our cases has adopted the distinction urged nor does it have any obvious basis in policy.

Constitutional claims are common in administrative proceedings--especially equal protection and procedural due process claims--and are part of the ordinary fodder of review in discharge cases. Often such claims are made along with factual claims denying the conduct alleged against the employee and statutory or rule-based claims as well. Congress' desire to consolidate employee removal in a single forum was based on the action taken

---

[4]Compare Dotson v. Griesa, 398 F.3d 156, 179-82 (2d Cir. 2005), and Lombardi v. Small Bus. Admin., 889 F.2d 961-62 (10th Cir. 1989), with Mitchum v. Hurt, 73 F.3d 30, 35-36 (3d Cir. 1996), and Hubbard v. EPA, 809 F.2d 1, 11 & n.15 (D.C. Cir. 1986), vacated in part on other grounds, Spagnola v. Mathis, 859 F.2d 223 (D.C. Cir. 1988) (en banc) (per curiam). The Supreme Court has not resolved the question. Whitman, 547 U.S. at 513-14.

against the employee rather than the precise arguments made in contesting that action.

What matters in the end is whether the CSRA process can afford relief.  The plaintiffs argue that a <u>facial</u> claim attacking the underlying statute is one for which the MSPB <u>cannot</u> grant relief to them and therefore the premise--that the CSRA remedy is exclusive where it applies--does not itself apply.  And to show that there is no MSPB remedy, the plaintiffs point to statements by the MSPB itself that it, "as an administrative agency, is without authority to determine the constitutionality of Federal statutes." <u>Bayly</u> v. <u>OPM</u>, 42 M.S.P.R. 524, 525-26 (1990).[5]

But while the Board may be powerless to strike down the statute, the Federal Circuit on review of the Board may do so, 5 U.S.C. § 7703(c), and, if it agreed with the plaintiffs on the merits, remand to the Board to grant relief.  <u>See</u> <u>Shalala</u> v. <u>Ill. Council on Long Term Care, Inc.</u>, 529 U.S. 1, 23-24 (2000); <u>Thunder Basin Coal Co.</u>, 510 U.S. at 215.  Accordingly, the CSRA regime <u>does</u> provide an opportunity for the plaintiffs to obtain a full determination of their facial constitutional challenge.  Indeed, even if the MSPB had the first word on the constitutional issue, it certainly would not have the last.

---

[5]This self-denying ordinance, distinguishing this subset of constitutional challenges from all others, is widely repeated in the case law, <u>e.g.</u>, <u>Califano</u> v. <u>Sanders</u>, 430 U.S. 99, 109 (1977), although it is "not mandatory," <u>Thunder Basin Coal Co.</u> v. <u>Reich</u>, 510 U.S. 200, 215 (1994).

-14-

Plaintiffs object that the Federal Circuit has regularly said that its jurisdiction is coextensive with that of the MSPB as to the categories of cases that fall within the CSRA. E.g., Rosano v. Dep't of the Navy, 699 F.2d 1315, 1318 (Fed. Cir. 1983). That proposition happens to be true as a general statement, but it was not made by the Federal Circuit in our context and would make no sense if it were: for in such cases the MSPB is limited only because of a doctrine that uniquely applies to administrative agencies and not to the Federal Circuit or any other Article III court.

The Federal Circuit has never said that it was powerless to act where a removal occurred and the underlying statute that prompted the removal was itself unconstitutional. On the contrary, that court has said that if a colorable constitutional claim were presented, it would have to address the issue. See Riggin v. Office of Senate Fair Emp't Practices, 61 F.3d 1563, 1570 (Fed. Cir. 1995) (discussing Webster v. Doe, 486 U.S. 592 (1988)); Brockmann v. Dep't of the Air Force, 27 F.3d 544, 546-47 (Fed. Cir. 1994) (same). And if it mistakenly held otherwise, the remedy would be on certiorari to the Supreme Court.

The substantive constitutional claims in this case are unpromising, given that one conflicts with governing Supreme Court precedent and the other ignores the fact that the plaintiffs were free to avoid the bar by timely registration. But the CSRA

-15-

channels removals covered by the CSRA--and thus the plaintiffs' claims--to the Federal Circuit, see Hall v. United States, 617 F.3d 1313, 1316 (Fed. Cir. 2010); that principle serves an important purpose; the CSRA provides a remedy for a meritorious facial challenge; and plaintiffs were obliged to use it.

The judgment of the district court is vacated and the case remanded for entry of a new judgment denying relief for lack of subject matter jurisdiction and without prejudice to the pursuit of remedies under the CSRA to the extent that they may be available at this late date. Each side shall bear its owns costs on this appeal.

It is so ordered.


**--Concurring Opinion Follows--**

**STAHL**, **Circuit Judge**, **concurring**. I concur in the ultimate result of this case, but not in the route taken in reaching it. I would find jurisdiction to consider the plaintiffs' claims, but hold that they fail as a matter of law.

## I. Jurisdiction

The majority reaches a reasoned conclusion, but I believe it falls short in considering fully the question of whether there is an applicable exception to the CSRA's preclusive effect. To be sure, the majority disposes of the plaintiffs' arguments regarding constitutional challenges generally and facial attacks specifically. It does not, however, take head-on the issue of whether federal district court jurisdiction remains intact if the CSRA does not afford meaningful review to the plaintiffs' colorable constitutional claims that sound in equity.[6] Because I find that the plaintiffs' claims would be unreviewable under the CSRA's remedial scheme, I would hold that federal district court jurisdiction exists, just as our sister circuits have done in comparable cases. See Am. Fed'n of Gov't Emps. Local 1 v. Stone, 502 F.3d 1027, 1034-39 (9th Cir. 2007); Mitchum v. Hurt, 73 F.3d 30, 34-36 (3d Cir. 1995); Hubbard v. EPA, 809 F.2d 1, 11-12 (D.C.

---

[6]The plaintiffs seek equitable relief in the form of a declaratory judgment that § 3328 and the Military Selective Service Act are unconstitutional; an injunction prohibiting the enforcement of § 3328; reinstatement to their agency positions; and back pay, benefits, and attorneys' fees.

Cir. 1986), vacated in part on other grounds, Spagnola v. Mathis, 859 F.2d 223 (D.C. Cir. 1988) (en banc) (per curiam).

As set forth in 28 U.S.C. § 1331, "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." The plaintiffs' claims arise under the Constitution, namely, the Bill of Attainder Clause in Article I, Section 9, and the Due Process Clause of the Fifth Amendment, which implicitly guarantees equal protection. See Bolling v. Sharpe, 347 U.S. 497, 499 (1954). The question, then, is whether the CSRA divested the federal district court of its jurisdiction conferred by § 1331. See Whitman v. Dep't of Transp., 547 U.S. 512, 514 (2006).

As explained by the majority, Congress enacted the CSRA in 1978 as a means to "'comprehensively overhaul[] the civil service system.'" United States v. Fausto, 484 U.S. 439, 443 (1988) (quoting Lindahl v. OPM, 470 U.S. 768, 773 (1985)). Prior to the CSRA, different employees were afforded different processes of review upon an adverse employment action, resulting in both federal court and administrative appeals with "wide variations" among decisions. Id. at 444-45. Congress sought to streamline these varied decisions by funneling federal employee personnel actions through the CSRA's administrative process. Id. at 445.

Although the CSRA does not explicitly prohibit plenary actions in federal district court, the Supreme Court has

interpreted the statute to have far-reaching preclusive effect.  In Bush v. Lucas, 462 U.S. 367 (1983), it held that a federal-employee plaintiff whose demotion allegedly violated the Constitution could not sue for damages, even though, assuming the violation occurred, his remedies under the CSRA would not fully compensate him for the harm he suffered.  Five years later, in United States v. Fausto, 484 U.S. 439, it found that the CSRA prevented a plaintiff from initiating suit in federal court for statutory and regulatory violations, even though the plaintiff was afforded no administrative review under the statute.

Despite this line of precedent, the Supreme Court has consistently found exceptions to the foreclosure of judicial review for colorable constitutional claims sounding in equity, absent clear congressional intent to the contrary.  The same year it decided Fausto, it also decided Webster v. Doe, 486 U.S. 592 (1988), in which a plaintiff sought equitable relief when challenging on both statutory and constitutional grounds his termination from the CIA due to his homosexuality.  The Court found the statutory claims unreviewable, but it rejected the government's argument that the constitutional claims were as well, holding:

> [W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear. . . . We require this heightened showing in part to avoid the "serious constitutional question" that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim.

-19-

486 U.S. at 603 (quoting Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 681 n.12 (1986)); see also McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479, 496 (1991) (finding federal question jurisdiction for plaintiffs' constitutional challenges despite comprehensive immigration statute due to lack of meaningful judicial review under statute and absence of clear congressional language mandating preclusion); Johnson v. Robison, 415 U.S. 361, 373-74 (1974) (holding that statute prohibiting judicial review of decisions by the administrator of Veterans Affairs did not provide "the 'clear and convincing' evidence of congressional intent required by this Court before a statute will be construed to restrict access to judicial review" of constitutional claims (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 141 (1967))).

Because I find that the CSRA's remedial scheme does not afford the plaintiffs meaningful review of their colorable constitutional claims for equitable relief, I would hold that the statute does not bar the present action and the plaintiffs may seek relief in federal district court.

The MSPB is a creation of statute, and its jurisdiction is limited. See 5 U.S.C. § 7701(a). Notwithstanding the question of whether the MSPB has the power to rule on constitutional issues, see Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 215 (1994), it is undisputed by the parties that the MSPB cannot adjudicate claims premised on removals due to an "absolute statutory prohibition" to

appointment. See, e.g., Hope v. Dep't of the Army, 108 M.S.P.R. 6, 9 (2008); Lovoy v. Dep't of Health & Human Servs., 94 M.S.P.R. 571, 586 (2003); Daneshpayeh v. Dep't of the Air Force, 57 M.S.P.R. 672, 676 (1993), aff'd, No. 93-3476, 1994 U.S. App. LEXIS 14360, 1994 WL 18964 (Fed. Cir. Jan. 26, 1994) (unpublished) (per curiam); Travaglini v. Dep't of Educ., 18 M.S.P.R. 127, 132 (1983), aff'd as modified, 23 M.S.P.R. 417, 419-20 (1984).

Section 3328 is an absolute prohibition to appointment because an individual who knowingly and willfully fails to register with the Selective Service System is barred from all executive agency employment, and he must be terminated if currently employed. See 5 U.S.C. § 3328; 5 C.F.R. §§ 300.701-.707. The MSPB consistently dismisses appeals related to terminations pursuant to § 3328 on these grounds, a position the government regularly advances before the Board and on which it succeeded in the MSPB appeal by Mr. Elgin, a plaintiff in this matter. E.g., Charner v. OPM, No. PH-3443-08-0601-I-2, 2009 M.S.P.B. LEXIS 1296, at *10-11 (Mar. 6, 2009) (unpublished); Whitfield v. Dep't of Interior, No. DC-0752-09-0094-I-1, 2008 M.S.P.B. LEXIS 6910, at *4, 7 (Dec. 23, 2008) (unpublished); Rivera v. Dep't of Veterans Affairs, No. NY-0752-08-0137-I-1, 2008 M.S.P.B. LEXIS 2056, at *7 (Mar. 31, 2008) (unpublished); Elgin v. Dep't of Treasury, No. PH-0752-08-0004-I-1, 2007 M.S.P.B. LEXIS 7502, at *9 (Nov. 16, 2007) (unpublished).

Indeed, the MSPB has often deemed frivolous the assertion that it has jurisdiction over cases contesting removals pursuant to § 3328. See, e.g., Whitfield, 2008 M.S.P.B. LEXIS 6910, at *1; Clarke v. OPM, No. DA-3443-07-0538-I-1, 2007 M.S.P.B. LEXIS 7101, at *1 n.1 (Dec. 17, 2007) (unpublished); Belmares-Avalos v. OPM, No. CH-300A-07-0351-I-1, 2007 M.S.P.B. LEXIS 4900, at *1 (May 9, 2007) (unpublished). Moreover, the regulations promulgated by OPM are entitled "Statutory Bar to Appointment of Persons Who Fail to Register Under Selective Service Law," and they state that administrative review beyond OPM's determination is prohibited. 5 C.F.R. §§ 300.701-.707; id. at .706(c).[7]

_____

[7]The majority states that, to the extent that the MSPB would have found that it lacked jurisdiction to hear the plaintiffs' claims because the plaintiffs were terminated pursuant to an absolute statutory prohibition to appointment, the MSPB would be wrong because the doctrine has never been endorsed by the Federal Circuit and is illogical. I believe that the majority oversteps in reaching this conclusion. First, as cited above, the MSPB routinely holds that it cannot hear appeals contesting removals based on absolute statutory prohibitions to appointment, and this precedent appears firmly established.

Second, the Federal Circuit has hardly indicated any error in the Board's finding. In Diamond v. U.S. Agency for International Development, 108 F.3d 312 (Fed. Cir. 1997), it cited with approval Travaglini v. Department of Education, 18 M.S.P.R. 127, 132 (1983), one of the leading cases to discuss the doctrine, although it did not apply the doctrine to the case at hand. In Daneshpayeh v. Department of the Air Force, 1994 U.S. App. LEXIS 14360, an unreported and non-precedential opinion, the Federal Circuit affirmed the MSPB's decision that the Board could not grant relief to a federal employee terminated pursuant to an absolute statutory prohibition to appointment. Although the court indicated in a footnote that it may have been incorrect for the MSPB to term this holding "jurisdictional," it still found that the Board could not grant relief because the employee's appointment was illegal. It is

Because the MSPB has routinely stated that it lacks jurisdiction to hear the plaintiffs' claims on the merits, it appears to me that the Federal Circuit is without jurisdiction to do so as well. The Federal Circuit's jurisdiction is derivative of the MSPB's jurisdiction, and it is problematic whether the Federal Circuit has the ability to decide matters beyond that of the Board. See Perez v. Merit Sys. Prot. Bd., 931 F.2d 853, 855 (Fed. Cir. 1991) ("Since the MSPB had no jurisdiction, the merits of Perez's challenge . . . were not before the MSPB for decision; nor are they before us."); Carroll v. Dep't of Health & Human Servs., 703 F.2d 1388, 1390 (Fed. Cir. 1983) ("'[W]ith respect to cases brought under [5 U.S.C. §] 7701, the scope of the subject matter jurisdiction of this court is identical to the scope of the jurisdiction of the Board.'" (quoting Rosano v. Dep't of the Navy, 699 F.2d 1315, 1318 (Fed. Cir. 1983))).

The majority places great faith in its presumption that the Federal Circuit would either find the MSPB competent to review the plaintiffs' claims and remand for a decision on the merits, or that it would look beyond its own jurisdictional constraints to reach the constitutional issues itself. The evidence to support these assertions, however, is elusive. First, although no

immaterial whether an absolute statutory prohibition to appointment is "jurisdictional" or simply precludes review; under either circumstance, the Board is unable to hear the merits of a plaintiff's claim.

-23-

plaintiff, in this suit or others, who was removed under § 3328 has ever sought Federal Circuit review of the MSPB's decision to dismiss for lack of jurisdiction, the case law and regulations cited above suggest that such efforts would be futile. Time and again the MSPB has dismissed these cases, claiming that it is unable to grant relief, and an appeal to the Federal Circuit seems almost certain to result in a simple affirmance. See Daneshpayeh, 1994 U.S. App. LEXIS 14360.

Second, the Federal Circuit has never reached beyond the limits of the MSPB to hear the merits of a claim otherwise barred from review. In only one instance has it hypothesized the possibility, and never before has it acted on the idea. See Brockmann v. Dep't of the Air Force, 27 F.3d 544, 546-47 (Fed. Cir. 1994) (acknowledging Supreme Court precedent supporting review of colorable constitutional claims otherwise barred, but finding precedent inapplicable because plaintiffs' claims unreviewable by the MSPB were not colorable). Indeed, when the Federal Circuit did confront a plaintiff covered by the CSRA who asserted constitutional claims that were beyond MSPB review, it affirmed the dismissal of his suit for lack of jurisdiction, rather than providing a forum for his constitutional claims. Hubbard v. Merit Sys. Prot. Bd., 319 Fed. Appx. 912 (Fed. Cir. 2009) (unpublished).

Such case law provides little comfort that the plaintiffs in this matter would fare any better.[8]

To be sure, administrative boards have been declared competent to review constitutional issues otherwise perhaps beyond their scope. See Shalala v. Ill. Council on Long-Term Care, Inc., 529 U.S. 1, 20-24 (2000) (interpreting Medicare statute to provide administrative review of constitutional claims); Riggin v. Office of Senate Fair Emp't Practices, 61 F.3d 1563, 1570 (Fed. Cir. 1995) (finding administrative board competent to review constitutional due process claim). In these instances, however, the administrative schemes at issue expressly precluded federal district court jurisdiction, and, therefore, would leave the constitutional claims without any forum were the boards unable to review them. See Shalala, 529 U.S. at 5, 8, 10 (finding Medicare Act to prohibit expressly federal-question jurisdiction); Riggin, 61 F.3d at 1570 (finding Government Employee Rights Act to prohibit expressly the commencement of judicial proceedings).

---

[8]The majority suggests that were the Federal Circuit not to address a colorable constitutional claim, the remedy would be on certiorari to the Supreme Court and not via a plenary federal district court action. I disagree with the majority because the doctrine obliging review of constitutional claims is relevant only when review is otherwise unavailable. Here, it appears that review under the CSRA's administrative scheme is foreclosed, and so I do not see why the federal district court is not the proper forum to review the claims. Indeed, the several circuits that have invoked this doctrine in the context of the CSRA have done so despite the Federal Circuit's ostensible ability to do the same. See Stone, 502 F.3d at 1034-39; Mitchum, 73 F.3d at 34-36; Hubbard, 809 F.2d at 11-12.

-25-

The CSRA contains no such clear prohibition of original federal court actions. Chapter 75 of the CSRA allows an agency to remove an employee "only for such cause as will promote the efficiency of the service," and upon such action, the employee "is entitled to appeal to the Merit Systems Protection Board." 5 U.S.C. § 7513(a), (d). Nowhere does the statute indicate explicitly that a plaintiff may not challenge his termination by raising colorable constitutional claims in federal court.[9]

Our sister courts in the Ninth, Third, and D.C. Circuits have held similarly and allowed federal employees to bring constitutional claims in district court actions seeking equitable relief. See Stone, 502 F.3d at 1034-39 (holding CSRA did not preclude judicial review of plaintiffs' First Amendment constitutional claims for equitable relief when plaintiffs had no remedy under the statute); Mitchum, 73 F.3d at 34-36 (finding CSRA and comparable statutes did not preclude federal district court review of plaintiffs' constitutional claims for injunctive and declaratory relief because CSRA not sufficiently clear to restrict federal power to grant equitable relief for constitutional violations); Hubbard, 809 F.2d at 11-12 & n.15 (holding federal

---

[9]To the extent that the majority opinion suggests that the plaintiffs' claims are not colorable, I disagree. There is a difference between colorable and meritorious claims, and although I would dismiss the plaintiffs claims as a matter of law, I do not find them lacking in "potential validity," see Makieh v. Holder, 572 F.3d 37, 42 (1st Cir. 2009). The district court's initial holding on the bill of attainder claim demonstrates as much.

district court had jurisdiction over First Amendment claim because the "CSRA does not preclude federal employees from seeking equitable relief against agencies for allegedly unconstitutional personnel actions"); Spagnola, 859 F.2d at 229-30 ("[T]ime and again this court has affirmed the right of civil servants to seek equitable relief against their supervisors, and the agency itself, in vindication of their constitutional rights.").

The Eleventh, Seventh, and Fourth Circuits have expressly avoided the question of whether the CSRA forecloses equitable relief for colorable constitutional claims; indeed, the Eleventh and Fourth Circuits have distinguished or questioned their prior precedent that suggests preclusion. See Hardison v. Cohen, 375 F.3d 1262, 1263, 1266-69 (11th Cir. 2004) (acknowledging serious question left unresolved as to whether the CSRA precludes equitable relief for constitutional challenges to terminations and distinguishing prior precedent in Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571 (11th Cir. 1990), based on availability of review and type of remedy sought); Paige v. Cisneros, 91 F.3d 40, 44 (7th Cir. 1996) (avoiding issue of whether CSRA precludes equitable relief for colorable constitutional claims because claim was not colorable); Bryant v. Cheney, 924 F.2d 525, 527-28 (4th Cir. 1991) (declining to address continued vitality of Pinar v. Dole, 747 F.2d 899 (4th Cir. 1984), in light of Webster and circuit split on issue). Indeed, the Supreme Court indicated the

-27-

significance of this issue in Whitman v. Department of Transportation, 547 U.S. 512, 514 (2006), remanding for a determination as to whether the CSRA removed federal question jurisdiction over constitutional challenges.

I acknowledge that some of our own precedent and unpublished decisions along with decisions in the Second and Tenth Circuits[10] suggest that the CSRA bars all federal actions related to civil service employment, but those cases are distinguishable. They did not involve the absence of meaningful administrative remedies, Dotson v. Griesa, 398 F.3d 156, 171-72, 182 (2d Cir. 2005) (noting lack of CSRA remedies but available relief through comparable statutory scheme); Harvey v. U.S. Postal Serv., No. 94-1729, 1995 U.S. App. LEXIS 9447 (1st Cir. Apr. 25, 1995) (unpublished) (CSRA remedies available); Berrios v. Dep't of the Army, 884 F.2d 28, 29-30 (1st Cir. 1989) (CSRA remedies available);[11] equitable claims, Harvey, 1995 U.S. App. LEXIS 9447, at *1-2; Roth v. United States, 952 F.2d 611, 613 & n.2 (1st Cir. 1991); or colorable constitutional challenges, Pathak v. Dep't of

_____

[10]Unpublished opinions from this court and opinions from other courts act as persuasive authority and are not binding precedent. See Fed. R. App. P. 32.1; 1st Cir. R. 32.1.0(a); United States v. Stepanian, 570 F.3d 51, 57 n.10 (1st Cir. 2009).

[11]Although the majority claims that Berrios definitely answers our present matter, the case is distinct. In Berrios, the plaintiff was afforded and took advantage of available CSRA remedies, and so the rationale for district court jurisdiction would not apply. Here, however, the plaintiffs have no statutory remedies.

<u>Veterans Affairs</u>, 274 F.3d 28, 31, 33 (1st Cir. 2001);[12] <u>Harvey</u>, 1995 U.S. App. LEXIS 9447, at *2; <u>Desmond</u> v. <u>Dep't of Defense</u>, No. 92-2201, 1993 U.S. App. LEXIS 5195, at *11-12 (1st Cir. Mar. 19, 1993) (unpublished); or they lacked meaningful analysis, <u>Lombardi</u> v. <u>Small Bus. Admin.</u>, 889 F.3d 959, 961-62 (10th Cir. 1989).

Consistent with <u>Stone</u>, <u>Mitchum</u>, and <u>Hubbard</u>, and the shift within the circuits, I would hold that for an administrative scheme to foreclose a plenary federal district court action seeking equitable relief and involving colorable constitutional claims, congressional intent must be clear. The CSRA does not meet this standard. I would then find that the plaintiffs' claims are afforded no meaningful review under the CSRA and, therefore, their claims are reviewable in federal district court.

## II. The Merits

Having found jurisdiction, I would dismiss the plaintiffs' claims on the merits.

## A. Bill of Attainder

The plaintiffs assert that § 3328 is an unconstitutional bill of attainder since it legislatively punishes men age twenty-six and older who failed to and can no longer register with the Selective Service System because it prohibits their employment with an executive agency. They assert that the statute satisfies the

---

[12]Indeed, in <u>Pathak</u> we acknowledged that, despite the CSRA's expansive reach, we might have jurisdiction to review the plaintiffs claims, were they colorable. 274 F.3d at 33.

-29-

requirements of a bill of attainder by identifying a class of men based on immutable past conduct and operating as a punishment without trial.  I disagree.

Article I, Section 9, Clause 3 of the United States Constitution reads: "No Bill of Attainder or ex post facto Law shall be passed."  With this clause the Framers "sought to prohibit the ancient practice of the Parliament in England of punishing without trial 'specifically designated persons or groups.'" Selective Serv. Sys. v. Minn. Pub. Interest Research Grp., 468 U.S. 841, 847 (1984) (quoting United States v. Brown, 381 U.S. 437, 447 (1965)).  The constitutional provision safeguards the notion of separation of powers by protecting against trial by legislature. Brown, 381 U.S. at 442.  Historically, bills of attainder were acts sentencing to death one or more specific persons, although the Supreme Court has read the clause to also outlaw what were known as bills of pains and penalties, which imposed less severe punishments.  Id. at 441; Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 323 (1867).  Targeted parties were typically those "who had attempted, or threatened to attempt, to overthrow the government." Brown, 381 U.S. at 441.

The Supreme Court has struck down statutes on bill of attainder grounds only five times in the nation's history.  See Cummings, 71 U.S. 277 (targeting Confederate sympathizers); Ex parte Garland, 71 U.S. (4 Wall.) 333 (1867) (same); Pierce v.

-30-

Carskadon, 83 U.S. (16 Wall.) 234 (1873) (same); United States v. Lovett, 328 U.S. 303 (1946) (targeting "subversives"); Brown, 381 U.S. 437 (targeting Communist Party members).  For a statute to qualify as a bill of attainder it must: (1) specify the affected person or group, (2) impose punishment by legislative decree, and (3) dispense with a judicial trial.  See Selective Serv. Sys., 468 U.S. at 847.  Because I would find that § 3328 does not specify an identifiable group or impose punishment, I would hold that the statute is not a bill of attainder.

### 1.  Specification

Typical bills of attainder evince specification by naming the person to be punished.  The Supreme Court has also recognized specification when legislation describes individuals "in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." Communist Party of the U.S. v. Subversive Activities Control Bd., 367 U.S. 1, 86 (1961); see also Cummings, 71 U.S. 277 (identifying individuals by past affiliation with Confederacy); Ex Parte Garland, 71 U.S. 333 (same).  In contrast, statutes of general applicability that focus on prospective conduct have withstood challenges on bill of attainder grounds.  See Brown, 381 U.S. at 446, 461; see e.g., Selective Serv. Sys., 468 U.S. at 848-51 (finding statute prospective and therefore not bill of attainder); Communist Party, 367 U.S. at 86-87 (finding statute not bill of attainder because it did not attach

-31-

to "past and ineradicable actions," but rather "turn[ed] upon continuingly contemporaneous fact").

Section 3328 does not meet the specification requirement to constitute a bill of attainder because it does not identify individuals for legislatively imposed punishment based on irreversible past acts. Rather, the statute is entirely prospective in nature. President Carter's Proclamation issued on July 2, 1980, dictated that men born on or after January 1, 1960, are required to register with the Selective Service System. Those born in the years 1960, 1961, and 1962 had six specified days to register. All men born during or after 1963 have thirty days both before and after their eighteenth birthdays to comply. Proclamation No. 4771.

Section 3328 became effective on November 8, 1985. On this date, the oldest person subject to its provisions would have been twenty-five. Thus, even if an individual had failed to satisfy timely the dictates of President Carter's Proclamation, under § 3328, he still had the opportunity to register with the Selective Service System and avoid disqualification from federal employment. See 5 C.F.R. §§ 300.704(b), 300.705(c); cf. Selective Serv. Sys., 468 U.S. at 849. As such, § 3328 does not identify any individuals "'ineluctably designated by the legislature' for punishment" because all men can comply prospectively. See

-32-

<u>Selective Serv. Sys.</u>, 468 U.S. at 847 (quoting <u>Communist Party</u>, 367 U.S. at 87).

The Supreme Court found similarly in <u>Selective Service System</u> v. <u>Minnesota Public Interest Research Group</u>, 468 U.S. at 849-51, when it held that § 12(f) of the Military Selective Service Act, which denies federal financial assistance to male students who fail to register for the draft, did not meet the specification requirement to constitute a bill of attainder.[13] Similar to § 3328, § 12(f) was enacted before any men subject to it would have been too old to register with the Selective Service System. Because § 12(f)'s implementing regulations permitted nonregistrants to register late, meaning, after the timeline delineated in Proclamation 4771, § 12(f) was not retrospective.

The plaintiffs counter that § 3328 is nevertheless a bill of attainder because it penalizes an easily identifiable group of men age twenty-six and older who are no longer eligible to register for the draft. They argue that Supreme Court precedent and historical parliamentary acts demonstrate that legislation qualifies as a bill of attainder even when punishment occurs post-enactment and is conditioned on future behavior. They advance that § 3328 is such a bill because it makes termination contingent upon the subsequent act of failing to register for the draft before

---

[13]The Supreme Court also determined that the statute did not meet the punishment requirement. As explained below, I would hold that neither does § 3328.

turning twenty-six.  Relatedly, they also assert that § 3328 should be evaluated as a bill of attainder at the time of enforcement rather than the time of enactment, and that under such analysis, the statute meets the specification element because men currently age twenty-six and older who did not register for the draft represent an easily ascertainable group.

The plaintiffs' arguments miss the mark.  To be sure, the Supreme Court has held that a statute conditioning punishment on future behavior may still constitute a bill of attainder, but this assertion is irrelevant.  Such statutes have met the specificity requirement because they have identified specific individuals or groups based on prior acts, irrespective of also providing these individuals with a means to escape punishment through some future performance.  See Brown, 381 U.S. at 442 (highlighting that statutes meet specification by designation of affected individuals, even if they provide escape clauses).

For example, in Cummings v. Missouri, 71 U.S. 277, the Supreme Court found invalid a Missouri constitutional amendment that prohibited people from engaging in certain professions unless they stated under oath that they had not given aid or comfort to the Confederacy.[14]  Although individuals could arguably escape

---

[14]The Constitution extends the prohibition of bills of attainder to the states.  U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any Bill of Attainder . . . .").

punishment by performing the oath,[15] the statute was still a bill of attainder because it identified the affected group based on immutable past conduct, prior sympathy and aid to the Confederate army.  Id. at 318 ("In the first place, [the amendment] is retrospective; it embraces all the past from this day."); see also Ex Parte Garland, 71 U.S. at 377 (involving federal statute directed at Confederates that contained an escape clause and was ultimately found to be a bill of attainder).  Section 3328, however, does not identify individuals in this manner because it is not directed at people who committed prior acts.  Rather, it is a broadly drawn statute of general applicability directed at prospective conduct and affecting all men regardless of their past actions, political affiliations, or ideological beliefs.

With respect to the plaintiffs' insistence that the court evaluate § 3328 at the time of enforcement rather than at the time of enactment, I would reject it.  A statute meets the specification element if it identifies individuals by name or by description of prior conduct so that it "operates only as a designation of

---

[15]The Supreme Court has noted the elusiveness of escaping punishment under the Missouri amendment at issue in Cummings.  In effect, prior Confederate sympathizers could not evade the employment bar because their only options were to abstain from the oath and lose their livelihood, or take the oath and perjure themselves.  See Selective Serv. Sys., 468 U.S. at 848.  To the extent that the plaintiffs analogize the Missouri amendment to § 3328 in that both provide "escape clauses," § 3328 does not present the double bind at issue in Cummings since men subject to § 3328 can avoid punishment through lawful actions.

particular persons." Communist Party, 367 U.S. at 86. A statute of general applicability that affects individuals only upon enforcement is not a bill of attainder; it is simply an example of the quintessential legislation that the Constitution tasks Congress with creating. See Brown, 381 U.S. at 461.

### 2. Punishment

Even if § 3328 fulfilled the specificity element, I would still find that it does not constitute a bill of attainder because it does not inflict punishment. Courts evaluate whether a statute satisfies the punishment element for bill of attainder purposes by considering: (1) whether the statute falls within the historical meaning of legislative punishment; (2) whether, in view of the type and severity of the burdens imposed, the statute reasonably can be said to further nonpunitive legislative purposes; and (3) whether the legislative record demonstrates a congressional intent to punish. Selective Serv. Sys., 468 U.S. at 852 (citing Nixon v. Admin. of Gen. Servs., 433 U.S. 425, 473, 475-76, 478 (1977)). "[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute" based on impermissible congressional motive. Flemming v. Nestor, 363 U.S. 603, 617 (1960). Further, "[e]ach case [turns] on its own highly particularized context." Id. at 616.

Section 3328 does not satisfy any of these punishment queries. It is true that "a legislative decree of perpetual

-36-

exclusion" from specific types of employment meets the historical understanding of a bill of attainder. Ex parte Garland, 4 U.S. at 377 (1867) (barring types of employment for Confederate sympathizers); see Cummings, 71 U.S. 277 (same); Lovett, 328 U.S. 303 (barring named individuals from federal employment); Brown, 381 U.S. 437 (barring Community Party members from positions within labor unions). But § 3328 does not act as a perpetual exclusion to employment because all men have an opportunity to register for the draft. A statute that allows men to "'carry the keys of their prison in their own pockets' . . . does not fall within the historical meaning of forbidden legislative punishment." Selective Serv. Sys., 468 U.S. at 853 (quoting Shillitani v. United States, 384 U.S. 364, 368 (1966)).

Also, it is reasonable to understand § 3328 as a means to further the nonpunitive goal of encouraging Selective Service System registration. The statute was enacted in conjunction with findings that detailed the importance of the draft registration program and an urging from Congress that the President "recognize . . . the contribution of our young men to the success of the peacetime registration program." See Pub. L. No. 99-145 §§ 1621, 1622(a), 99 Stat. 583, 776-77 (1985). It also complements President Carter's directive to executive agencies to "cooperate and assist" in the draft registration requirements. Proclamation No. 4771. The conditioning of civil service employment on draft

-37-

registration, then, acts as a "rational means to improve compliance," which is a legitimate nonpunitive objective. See Selective Serv. Sys., 468 U.S. at 854.

Finally, I would not find the "clearest proof" from the congressional record that Congress intended § 3328 to act as a form of punishment. Admittedly, Senator Strom Thurmond, the statute's sponsor, deemed it "unpatriotic" to permit nonregistrants to enjoy the privileges and benefits of civil service positions. 131 Cong. Rec. S6627 (1985). These comments alone, however, do not suffice as "'unmistakable evidence of punitive intent which . . . is required before a Congressional enactment of this kind may be struck down.'" Selective Serv. Sys., 468 U.S. at 855 n.15 (alterations in original) (quoting Flemming, 363 U.S. at 619); see also Chrysler Corp. v. Brown, 441 U.S. 281, 311 (1979) ("The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history."). Little other legislative history of the statute exists, and what the record does contain suggests nonpunitive motives. Senator Sam Nunn, the only other senator who offered substantive remarks during debate on the legislation, lent his support to the statute, but underscored the importance of allowing a person to register late despite Proclamation 4771's mandates. 131 Cong. Rec. S6627. His concern for the ability of nonregistrants to correct their failure demonstrates the legislation's goal of encouraging compliance.

-38-

For these reasons, I would find that § 3328 is not a bill of attainder and affirm the dismissal of this claim.

**B. Equal Protection**

For their second constitutional claim, the plaintiffs contend that § 3328 and the Military Selective Service Act on which it is predicated violate equal protection as guaranteed by the Fifth Amendment because the statutes draw unlawful gender-based distinctions. The plaintiffs acknowledge that the Supreme Court has already evaluated the constitutionality of the Military Selective Service Act upon an equal protection challenge in Rostker v. Goldberg, 453 U.S. 57 (1981). They argue that Rostker is no longer good law, however, due to subsequent precedent from United States v. Virginia, 518 U.S. 515 (1996), which, they posit, altered the legal standard governing equal protection claims, and due to dramatic changes in the roles of women in the military.

Because Rostker stands on all fours with the present matter, I would reject the plaintiffs' challenge. Despite changes in the military and the extent, if any, of Virginia's impact on the equal protection standard as applied here, principles of stare decisis would mandate the finding that Rostker is controlling and that plaintiffs' claim are meritless. See Agostini v. Felton, 521 U.S. 203, 237 (1997) ("We reaffirm that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of

Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'" (quoting Rodriquez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989))); see also Tenet v. Doe, 544 U.S. 1 (2005) (reversing Ninth Circuit because its holding was "quite wrong" and "contravene[d] [] longstanding" Supreme Court precedent).

In Rostker, the Supreme Court held that the Military Selective Service Act does not violate equal protection by requiring men, but not women, to register for the draft. It noted that Congress is afforded due deference in matters involving national defense and the constitutionality of its enactments, and the extensive congressional record of the statute demonstrated that Congress made a "studied choice" in excluding women from the registration requirements. Id. at 64-69, 72-77. It then held that the statute was not an instance of unlawful gender discrimination. The government had an important interest in raising and supporting armies, as detailed in Article I, Section 8 of the Constitution. Id. at 70-72. The gender classification excluding women from the draft was closely related to this interest because the purpose of registration was to facilitate a draft for combat troops, and women were ineligible for combat. Id. at 75-79. No part of Rostker has been overruled, and its holding would foreclose any review of the plaintiffs' claim.

To be sure, the current reality of the armed forces represents a marked shift from 1981, when Rostker was decided. According to the plaintiffs' complaint, more than 200,000 women presently serve in the United States military, and women now make up 15 percent of the armed forces, compared to 8.4 percent in 1980. Legislation enacted after the decision is Rostker permits women to serve on Navy combat ships and fly combat aircraft, and a new Navy policy will allow women to serve on submarines. See Pub. L. No. 103-160, § 541, 107 Stat. 1547, 1659 (1993) (repealing ban on assignment of women to combat ships); Pub. L. No. 102-190, § 531, 105 Stat. 1290, 1365 (1991) (repealing ban on women from serving on aircraft engaged in combat missions); Commander, Submarine Forces Public Affairs, Navy Policy Will Allow Women to Serve Aboard Submarines, navy.mil, (Apr. 29, 2010, 6:35 AM), http://www.navy.mil/search/display.asp?story_id=52954. Even more, the congressional Military Leadership Diversity Commission recently issued a final report urging Congress to allow women into male-only land combat units. From Representation to Inclusion: Diversity Leadership for the 21st-Century Military, Final Report (Military Leadership Diversity Comm'n, Arlington, Va.) Mar. 15, 2011, at 71-74, 127, available at http://mldc.whs.mil/index.php/final-report.

Despite these developments, women are still precluded from ground combat positions. Further, Congress has demonstrated an acute awareness of the gender distinctions in draft registration

-41-

requirements, and yet it has not amended the statute. <u>See</u>, <u>e.g.</u>, Pub. L. No. 109-163, § 541(a)(1), 119 Stat. 3136, 3251-52 (2006) (directing Secretary of Defense to provide advance notice of changes to ground combat policy along with "detailed analysis of legal implication of the proposed change with respect to the constitutionality of the application of the Military Selective Service Act to males only." (internal citation omitted)). Indeed, the House's Armed Service Committee took pains to explain that repeals to certain bans on women-in-combat positions should not be "construed as tacit committee concurrence in an expansion of the assignment of women to units or positions whose mission requires routine engagement in direct combat on the ground, or be seen as a suggestion that selective service registration or conscription include women." H.R. Rep. No. 103-200, pt. 2 (1993). In any event, it would not be for this court to determine what, if any, impact these developments had on the continued vitality of <u>Rostker</u>, a task left solely to the Supreme Court.

### III. Conclusion

For the foregoing reasons, I concur in the judgment. I would find jurisdiction to hear the plaintiffs' claims but ultimately affirm their dismissal on the merits.